## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re GARY BERNHARD | : | Chapter 7 |
| | : | |
| Debtor | : | Bky. No. 11-15799 ELF |
| _____ | : | |
| GARY BERNHARD | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN KULL | : | |
| THERESA KULL | : | |
| PAUL BUCCO, et al. | : | |
| | : | |
| Defendants | : | Adv. No. 19-167 |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, Gary Bernhard ("the Debtor") seeks a determination that

Defendants Brian Kull ("Mr. Kull") and his wife, Theresa B. Kull (collectively, "the Kulls"),

along with the Kulls' attorneys ("the Bucco Defendants"),[1] are in contempt of the discharge

order ("Discharge Order") entered in this chapter 7 bankruptcy case on December 15, 2011.  As

remedies, the Debtor seeks the entry of an order requiring the Defendants to cease all collection

activity, and attorney's fees.[2]

---

[1]     The Bucco Defendants are Paul Bucco, Nathaniel Flandreau, John Dorsey, David S. Markar, and the law firm that employed them, Davis, Bucco & Ardizzi.  When referring to the Kulls and the Bucco Defendants collectively, I will use the simple term, "the Defendants."

[2]     At trial, the Debtor presented no evidence of either out-of-pocket damages or damages for emotional distress.

There is no question that the Defendants attempted to collect a prepetition debt after the entry of the discharge. But the back story is far more complicated because the Debtor failed to list the Kulls as creditors in his bankruptcy schedules and made numerous payments to the Kulls on the debt after the entry of his discharge order.

The Defendants also maintain that this underlying prepetition debt was the product of the Debtor's fraud. Consequently, based on the discharge exception found in 11 U.S.C. §523(a)(3)(B), the Defendants seek to justify their post-discharge collection actions on the ground that the discharge order entered in the Debtor's bankruptcy case did not discharge the subject debt.

The Debtor disputes the applicability of §523(a)(3). He asserts that even though the Kulls were not scheduled as creditors and received no notice of the filing from the court, he told Mr. Kull of his bankruptcy filing in time for the Kulls to file a nondischargeability claim and therefore, §523(a)(3) is inapplicable.

Finally, the Defendants argue that even if their conduct violated the Debtor's bankruptcy discharge order, they lacked the necessary scienter to hold them in contempt under the standard stated by the U.S. Supreme Court in <u>Taggart v. Lorenzen</u>, 139 S. Ct. 1795, 1801 (2019).

For the reasons explained below, I conclude the following:

(1) the Kulls had no notice of the bankruptcy case in time to assert a claim that the debt is nondischargeable, making the §523(a)(3) discharge exception potentially applicable;

(2) however, the Debtor did not engage in fraud, and the underlying debt was discharged when he received his chapter 7 discharge despite the lack of notice to the Kulls;

(3) the Defendants violated the discharge injunction through their collection actions;

(4) however, the contempt remedy does not lie against the Defendants because
they lacked the requisite scienter as prescribed in <u>Taggart</u>; and

(5) the sole relief to which the Debtor is entitled is a determination that the subject
debt is discharged.

## II.  PROCEDURAL HISTORY

The Debtor filed a chapter 7 bankruptcy case on July 24, 2011.  He received his

bankruptcy discharge on December 15, 2011. The court closed his case the same day.

On April 27, 2016, on the Debtor's motion, the court reopened the case to permit the

Debtor to seek to avoid a judicial lien pursuant to 11 U.S.C. §522(f).  It appears that court did not

re-close the case after the entry of the lien avoidance order.[3]

On August 23, 2019, the Debtor commenced this adversary proceeding by filing an

adversary complaint.  The Kulls filed an answer to the complaint on September 25, 2019, and,

with leave of court (over the Debtor's objection), an amended answer on December 23, 2019.

The Bucco Defendants filed an answer to the complaint on October 10, 2019, and an amended

answer on October 30, 2019.

On February 19, 2020, the Debtor filed a motion for summary judgment.  All Defendants

contested the motion. The last summary judgment submission was filed on April 5, 2020.  On

June 10, 2020, by oral bench opinion and accompanying order, I denied the Debtor's motion for

summary judgment.

---

[3]       There is a notation on the docket on May 9, 2016, that the case was "Terminated for statistical
Purposes."  But no order was entered re-closing the case.

On August 20, 2020, the court held and concluded the trial. The parties presented testimony from three (3) witnesses: the Debtor, Mr. Kull, and Defendant Paul Bucco. The parties offered thirty-three (33) exhibits into evidence.

After the conclusion of the trial, the Debtor and the Bucco Defendants filed proposed findings of fact, conclusions of law, memoranda, and reply memoranda, the last of which was filed on November 20, 2020.[4]

### III. FINDINGS OF FACT

### A. Pre-Bankruptcy

1.  From 1988 to 2011, the Debtor operated a company known as GB Excavating ("GBE"), which provided real property site development services as a subcontractor. (Notes of Testimony at 94-95, 156) ("N.T.").

#### The Blackstone Lease

2.  In June 2005, GBE, with the aid of an equipment broker, Metrix Financial Group ("Metrix"), entered into a Sale/Lease Back Agreement (the "Blackstone Lease") with Blackstone Equipment Financing, L.P. ("Blackstone") whereby GBE sold to and leased back certain equipment from Blackstone. (Joint Pretrial Statement ¶ 8) ("JPS").

3.  The purpose of the transaction was to pay off existing debt on certain pieces of equipment and provide GBE with additional capital. (N.T. at 157).

4.  The Blackstone Lease was for a term of five (5) years, requiring GBE to make monthly payments of $5,794.23. (Pl.'s Ex. 29).

---

[4]     The Debtor's prolix submissions totaled one hundred forty-six (146) pages and the Bucco Defendants' submissions totaled eighty-six (86) pages. The Kulls did not file any post-trial memoranda.

5.  The Debtor and Susan Bernhard personally guaranteed the GBE payment obligation under

the Blackstone Lease.  (Pl.'s Ex. 29).

6.  Fourteen (14) pieces of equipment were the subject of the Blackstone Lease, including two

(2) items referred to as a 1995 Bomag roller ("the Roller") and a Caterpillar crawler loader

("the CAT Crawler").  (Pl.'s Ex. 29, Schedule A).

7.  The Blackstone Lease purports to be a "true lease and not a lease intended as security," but it

also provided for Blackstone to file a UCC-1 security agreement in the event the lease was

determined to serve as security.  (Pl.'s Ex. 29).

8.  No provision of the Blackstone Lease provided GBE with the right to repurchase the

equipment at the end of the lease term.  (Id.).

9.  Nevertheless, at the time of the transaction, the Debtor believed that GBE continued to own

the equipment, with the equipment serving to secure GBE's repayment obligation to

Blackstone and that GBE would regain full ownership of the equipment for $1.00 at the end

of the lease term.  (N.T. at 96).[5]

**The 2009 Note**

10. In 2008, GBE was experiencing financial difficulties.  The Debtor approached Mr. Kull for a

loan.  (N.T. at 158).

11. Mr. Kull and the Debtor were lifelong friends, and the Debtor was godfather to the Kulls'

son.  (N.T. at 178).

---

[5]      The Debtor did not read the Blackstone Lease prior to signing it because he had hired an
equipment broker, Metrix, to arrange the transaction.  (N.T. at 96-97).  I find the Debtor's testimony
credible regarding his understanding (accurate or not) of the terms of the Blackstone Lease.  The Debtor's
testimony is corroborated by the term sheet Metrix sent the Debtor, which listed the equipment to be
collateralized, the 60-month term, the monthly payment, and a $1.00 payment option at the end of the
term.  (Id. at 98-99; Pl's Ex. 7).

12. On July 17, 2008, the Kulls wrote a check to "G-B Excavating Inc." in the amount of $10,000.00. (Pl's Ex. 5).

13.  On April 10, 2009, the Kulls wrote a second check to "G-B Excavating" in the amount of $50,000.00. (Id.).[6]

14. The Debtor or his agent deposited the monies issued to GBE in GBE bank accounts and the transaction was accounted for on the books and records of GBE (on the corporate balance sheet). (JPS ¶ 13).

15. At the time the Debtor borrowed the $50,000.00 from the Kulls, he believed the payoff to Blackstone would be $1.00 at the end of the lease term. (N.T. at 103).

16. On or about June 10, 2009, the Debtor signed a promissory note in the amount of $60,000.00, wherein he promised to repay to Mr. Kull $60,000.00, plus interest (the "2009 Note"). (JPS ¶10).[7]

17. Initially, GBE made repayments to the Kulls. (Id.).

---

[6]     Mr. Kull testified that he lent the Debtor the $50,000 because the Debtor said he owed that amount of money to Blackstone. (Id. at 178, 181-82). I find Mr. Kull's memory on this point to be faulty.

I have credited the Debtor's testimony that he believed that he would owe Blackstone only $1.00 at the end of the lease term. He did not learn that the required payment would be $50,000.00 until later in 2009, after he signed the 2009 Note. See Finding of Fact Nos. 24-26, infra.

In light of this chronology, I consider it more likely that the Debtor expected to use the money for additional capital, pay Blackstone its monthly payment and complete the transaction by paying $1.00 at the end of the lease term, rather than paying off the Blackstone debt early with the $50,000.00 he received from Mr. Kull.

[7]     The July 17, 2008, and April 10, 2009, checks to GBE were written on the Kulls' joint account. The 2009 Note is payable to Mr. Kull. In the collection actions that led to this adversary proceeding, the Kulls were joint plaintiffs. A later Note signed by the Debtor for the same debt, see Finding of Fact No. 51, is in favor of both Kulls. The parties have treated the distinctions as immaterial and, therefore, so will I.

18. At the time the Debtor signed the 2009 Note, he intended to repay the debt to the Kulls. (Id.).

19. The 2009 Note stated that the Debtor and Mr. Kull executed the 2009 Note "for value received on March 13, 2009, and to be repaid in full, to include interest."  (Pl.'s Ex. 3.1; Bucco Ex. 6).

20. When the Debtor and Mr. Kull signed the 2009 Note, Kull requested that the Debtor provide an appraisal of the equipment that the Debtor intended to use as security for the loan.  (N.T. at 111-12).

21. Attached to the 2009 Note as an exhibit was an equipment appraisal conducted by CD Valuation Services listing twelve (12) items, two (2) of which were circled: the Roller and the CAT Crawler.  (Bucco Ex. 6).[8]

22. The Debtor and Mr. Kull intended that the Roller and Crawler serve as security for repayment of the 2009 Note.  (N.T. at 181).

23. From August 2009 through December 2009, the Debtor or GBE paid the Kulls $3,500.00. (Pl.'s Ex. 4).


**The Blackstone Collection Efforts**

24. On October 22, 2009, Blackstone sent the Debtor a lease payoff quote of $53,828.11 or a six percent (6%) discounted payoff of $50,880.01, if paid by October 31, 2009.  (Pl.'s Ex. 8).

25. Upon payment, Blackstone agreed to release its security interest in the equipment.  (Id.).

26. Believing the payoff quote was incorrect, the Debtor disputed the amount.  (Id. at 101).

---

[8]        On Schedule A of the Blackstone Lease, the CAT Crawler is listed as a year 2000 model and on the attachment to the 2009 Note, it is listed as a year 1999 model.  However, the serial numbers on the two (2) documents match.

27. Following expiration of the Blackstone Lease on July 1, 2010, GBE neither turned over the equipment to Blackstone nor satisfied the payoff quote.

28. On November 10, 2010, Blackstone filed a complaint against the Debtor and Susan Bernhard in the United States District Court for the Central District of California, <u>Blackstone Equip. Fin., L.P. v. Bernhard</u>, No. SACV 10-01733 (the "California Litigation"), asserting that they owed Blackstone $195,007.31, pursuant to the terms of the Blackstone Lease, because GBE retained possession of other pieces of equipment after the expiration of the Blackstone Lease. The complaint also raised a claim for conversion because the Debtor had sold three (3) pieces of equipment at auction.

29. The Debtor and Susan Bernhard filed a counterclaim against Blackstone alleging usury, fraud, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, and violations of various California consumer protection laws

30. Blackstone obtained a judgment against the Debtor in the California Litigation. (N.T. at 102, 107).

31. GBE ceased business operations in March 2011. (N.T. at 160).

32. In May 2011, the Debtor sold the Roller for $16,000.00 and most likely used the proceeds to pay a contractor rather than the Kulls. (<u>Id</u>. at 127-29, 169).

## B. The 2011 Bankruptcy Case

33. The Debtor informed Mr. Kull in early 2011 he was considering filing for bankruptcy. (<u>Id</u>. at 184).

34. Mr. Kull asked the Debtor whether Mr. Kull would be included in the bankruptcy and the Debtor replied "no." (<u>Id</u>. at 184-85).

35. The Debtor filed a voluntary petition under chapter 7 in this court on July 24, 2011.

36. The entry of the Blackstone judgment in the California Litigation caused the Debtor to file
the bankruptcy case. (N.T. at 107).

37. During the first week in August 2011, the Debtor and Mr. Kull (and others) took a trip to the
Sturgis Motorcycle Rally in South Dakota. (N.T. at 107, 185).

38. On his bankruptcy schedules, Debtor listed both his personal debts and the debts of GBE that
he had personally guaranteed. (JPS ¶ 21).[9]

39. The Debtor did not list the debt owed to the Kulls on his bankruptcy schedules. (Id. ¶ 18).

40. The Debtor did not inform the Kulls of his bankruptcy filing after it was filed and prior to the
entry of his bankruptcy discharge.

41. The Kulls were unaware of the existence of the Debtor's bankruptcy case prior to the
expiration of the October 21, 2011, deadline for objecting to discharge or a complaint to
determine dischargeability of a debt. (N.T. at 185, 188).

42. The Kulls became aware of the bankruptcy case as of December 15, 2011, the day the
discharge was entered and the bankruptcy case was closed.[10]

43. The Debtor did not inform his attorney of the debt to the Kulls. (Id. ¶ 19).

44. The Debtor did not inform the chapter 7 trustee at the 11 U.S.C. §341 meeting of creditors of
the debt owed to the Kulls. (Id. at ¶ 20).

---

[9]      Strangely, the Debtor listed both the Roller and a CAT Crawler as assets in his bankruptcy
schedules. (Ex. D-10, Schedule B.29). Not only were both assets of GBE, but he had sold the Roller just
a few months earlier.

[10]      This finding resolves what probably was the most hotly contested factual issue at trial. The
Debtor contends that he told Mr. Kull of the bankruptcy filing within approximately one (1) week after he
filed the case. Mr. Kull denies this. I will discuss the reasons for my finding in Part V.B.3, infra.

45. In the Debtor's bankruptcy case, the deadline for filing an objection to discharge or a

complaint to determine dischargeability of a debt was October 21, 2011.  (Bky. No. 11-

15799, Doc. # 10).

46. On November 2, 2011, the chapter 7 trustee filed a Report of No Distribution, certifying that

there were no assets available for distribution to creditors.  (Bky. No. 11-15799. Docket

Entry dated Nov. 2, 2011).

47. On December 15, 2011, this court entered a discharge order in the Debtor's bankruptcy case

pursuant to 11 U.S.C. §727.[11]  The discharge order was accompanied by a written

explanation which included a description of the type of collection efforts prohibited by the

discharge.

48. No reaffirmation agreements under 11 U.S.C. §524(c) and (m) were filed with the court

during the pendency of the bankruptcy case.

49. On August 24, 2011, Blackstone filed an adversary complaint in the bankruptcy court against

the Debtor seeking a determination that a debt in excess of $100,000.00 was

nondischargeable under 11 U.S.C. §523(a)(2) and (a)(6).  (Adv. No. 11-0734, Doc. # 1) ("the

Blackstone AP").

---

[11]     Section 727(b) of the Bankruptcy Code, 11 U.S.C. §727(b), provides:

> (b) Except as provided in section 523 of this title, a discharge under subsection (a) of this
> section discharges the debtor from all debts that arose before the date of the order for
> relief under this chapter, and any liability on a claim that is determined under section
> 502 of this title as if such claim had arisen before the commencement of the case,
> whether or not a proof of claim based on any such debt or liability is filed under
> section 501 of this title, and whether or not a claim based on any such debt or liability
> is allowed under section 502 of this title.

50. The Blackstone AP was settled by Stipulation filed and approved on November 4, 2011,

pursuant to which the Debtor agreed to "turn over" to Blackstone certain equipment and

vehicles, including the CAT Crawler, and acknowledged Blackstone's right to pursue any

available remedies regarding equipment subject to the Blackstone Lease that were no longer

in the Debtor's possession.  Blackstone also agreed to dismiss the California Litigation and

the Blackstone AP.   (Adv. No. 11-0734, Doc. #'s 5, 6).


### C.  Post-Bankruptcy 2012-2018

51.  On February 14, 2012, the Debtor signed a second promissory note (the "2012 Note") in

    favor of the Kulls.  The 2012 Note provided:

> On July 7, 2008, Brian and Theresa B. Kull gave Gary Bernhard a check in the
> amount of $10,000.00.  On April 10, 2009, Brian and Theresa B. Kull gave Gary
> Bernhard a check in the amount of $50,000.00. (To payoff his Blackstone Leasing
> Company).
>
> Gary Bernhard promised to repay the loan and interest to Brian and Theresa B.
> Kull.
>
> As of 2/14/2010 the total of the loan and interest is:
> $63,800.0
>
> I Gary Bernhard agree to pay in full the above amount to Brian and Theresa B.
> Kull.

(Pl.'s Ex. 6).

52. The 2012 Note referred to the two (2) checks the Kulls gave GBE in 2009 as a "loan" and

stated that its purpose was "[t]o payoff his Blackstone Leasing Company."  Also, the 2012

Note stated the amount due as of February 14, 2012, was $63,800.00.  (Id.).

53. In addition, at the request of the Kulls, on February 13, 2012, Gary Bernhard had his will

re-drafted to include Mr. Kull.  (JPS ¶ 28).

11

54. The Debtor never informed Mr. Kull that he had sold the Roller in 2011 and turned over the

    CAT Crawler to Blackstone.  (Id. at 184).

55. At some point after August 2012, Mr. Kull consulted a lawyer who informed him that if Mr.

    Kull was not named as a creditor during the bankruptcy case the Debtor was required to

    repay him.  (Id. at 218-19).

56. From May 2012 through October 2018, the Debtor paid the Kulls $11,177.66, mostly in

    monthly increments of $300.00.  (JPS ¶ 26; Pl. Ex. 18).


**The Collection Action in State and Federal Court**

57. On February 1, 2019, the Kulls, represented by the Bucco Defendants, filed a complaint ("the

    C.P. Complaint") against the Debtor in the Court of Common Pleas, Montgomery County

    ("the C.P. Court"), at  No. 2019-02231, requesting a money judgment in excess of

    $50,000.00 based upon breach of the 2012 Note and, in the alternative, unjust enrichment.

    (Pl.'s Ex. 13).

58. When the C.P. Complaint was filed, both the Kulls and the Bucco Defendants were aware of

    the Debtor's bankruptcy case and the discharge order.  (N.T. at 30; Pl. Ex. 13).[12]

59. The Debtor filed preliminary objections asserting that the debt was discharged in the

    Debtor's bankruptcy case.  (N.T. 58; Pl. Ex. 30).

60. The C.P. Court overruled the preliminary objections.  (N.T. at 67).

---

[12]       At trial, the Debtor's counsel read into the record certain facts that were deemed to be admitted
by the Kulls based on an order I entered on March 11, 2020, pursuant to under Fed. R. Civ. P. 36.  (See
Adv. No. 19-167, Doc. # 80).  As for the Bucco Defendants, they agree that they were aware of the
bankruptcy case and the discharge.  (N.T. at 55).  Also, the fact is indisputable.  The Bucco Defendants
attached the bankruptcy case docket as an exhibit to the C.P. Complaint.

61. Thereafter, the Debtor filed a notice of removal of the state court action to the U.S. District Court for the Eastern District of Pennsylvania, where the case was docketed as No. 19-cv-02081. (Pl.'s Ex. 14).

62. On July 8, 2019, the Kulls filed an amended complaint in the district court adding a claim for fraud. (Pl.'s Ex. 16).

63. The Debtor filed a motion to dismiss for failure to state a claim (again, relying upon the discharge order). (Pl.'s Ex. 17).

64. On July 29, 2019, the district court remanded the case to the C.P. Court.[13]

65. In pursuing their collection efforts on the Debtor's debt to the Kulls, the Defendants subjectively believed that the debt was excepted from discharge by 11 U.S.C. §523(a)(3). (N.T. at 64, 69, 71, 84-85).

## IV. APPLICABLE LEGAL PRINCIPLES

### A. CONTEMPT

There is no dispute that the Debtor received a chapter 7 discharge. Section 524(a) of the Bankruptcy Code provides, in pertinent part, that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor." 11 U.S.C. §524(a)(2).

There is no statutory private right of action in the Bankruptcy Code for violation of the discharge injunction and it is unlikely that an implied right of action exists. See, e.g., In re

---

[13]    There is nothing in the evidentiary record regarding the remand, but the fact is not disputed. Also, it is a fact subject to judicial notice. See, e.g., In re Culler, 584 B.R. 516, 522 n.5 (Bankr. E.D. Pa. 2018).

Brown, 481 B.R. 351, 357 (Bankr. W.D. Pa. 2012); see also Church v. Accretive Health, Inc.,

2014 WL 7184340 (Bankr. S.D. Ala. Dec. 16, 2014); see generally In re Joubert, 411 F.3d 452,

457 (3d Cir. 2005) (11 U.S.C. §105(a) does not afford debtors a private cause of action to

remedy alleged violations of 11 U.S.C. §506(b)).

However, a debtor is not without remedy for a violation of the discharge order and the

statutory injunction.  It is settled law that the discharge injunction is enforceable through a

contempt motion invoked pursuant to 11 U.S.C. §105. E.g., In re Zine, 521 B.R. 31, 38 (Bankr.

D. Mass. 2014); Richard Levin & Henry J. Sommer, 4 Collier on Bankruptcy ¶ 524.02 (16th ed.

2021) ("Collier").  Indeed, some courts have held that the sole remedy for enforcing an alleged

violation of the discharge order is by a motion for contempt.  See Barrientos v. Wells Fargo

Bank, N.A., 633 F.3d 1186, 1190 (9th Cir. 2011); Cox v. Zale Delaware, Inc., 239 F.3d 910, 917

(7th Cir. 2001).  Bankruptcy courts have regularly exercised their contempt power in order to

remedy violations of the discharge injunction.  See In re Meyers, 344 B.R. 61, 64-65 (Bankr.

E.D. Pa. 2006) (collecting cases).

Sanctions for civil contempt may be granted when three (3) elements have been

established: (1) a valid order has been entered; (2) the person to be charged with contempt has

actual knowledge of the order; and (3) the person has disobeyed the order.  E.g., In re Foltz, 324

B.R. 250, 253 (Bankr. M.D. Pa. 2005); In re Antonious, 373 B.R. 400, 407 (Bankr. E.D. Pa.

2007).  Translated into the bankruptcy context for a claim of contempt for violation of the

bankruptcy discharge injunction, the debtor must show that (1) a discharge order has been

entered (discharging the debt); (2) the defendant was aware of the discharge order; and (3)

collection efforts continued, nevertheless.  See In re Englert, 495 B.R. 266, 271 (Bankr. W.D. Pa.

2013).

The Supreme Court recently articulated the state of mind standard required for holding a creditor in civil contempt for taking collection activities in violation of a bankruptcy court discharge order.  See Taggart v. Lorenzen, 139 S. Ct. 1795 (2019).

A court may hold a creditor in civil contempt for violating a discharge order if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order — or, put another way — when there is "*no fair ground of doubt* as to whether the order barred the creditor's conduct." Id. at 1799, 1801.  This standard is objective; a party's subjective belief that its actions complied with a court's order will not insulate the party from contempt sanctions where that belief was objectively unreasonable. Id. at 1802.  In short, a creditor may be held in civil contempt if "the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." Id.[14]

Upon a finding of civil contempt, the court has broad discretion in fashioning an appropriate remedy, which may include compensatory damages, punitive damages, and attorneys' fees.  See In re Odom, 570 B.R. 718, 723 (Bankr. E.D. Pa. 2017); Foltz, 324 B.R. at 253; Meyers, 344 B.R. at 66; 4 Collier ¶ 524.02.

### B.  §523(a)(3)

The Defendants do not dispute that they attempted to collect a prepetition debt after the entry of the Debtor's discharge.  Their first line of defense to the Debtor's claim is that the debt was not discharged in the case through operation of 11 U.S.C. §523(a)(3)(B).

---

[14]    Nevertheless, a party's subjective intentions may play a role in the court's analysis.  For example, a party's subjective good faith may be a mitigating factor in the court's determination of appropriate sanctions.  Taggart, 139 S. Ct. at 1802.

Section 523(a)(3) provides, in pertinent part, that a chapter 7 discharge does not

discharge an individual debtor from any debt

>  (3) neither listed nor scheduled under section 521(a)(1) of this title, with the
>  name, if known to the debtor, of the creditor to whom such debt is owed, in
>  time to permit—

>  *   *   *

>  (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this
>  subsection, timely filing of a proof of claim and timely request for a
>  determination of dischargeability of such debt under one of such
>  paragraphs, unless such creditor had notice or actual knowledge of
>  the case in time for such timely filing and request . . . .

11 U.S.C. §523(a)(3).[15]

By its express terms, subsection (B) only applies to unlisted debts that are "of a kind

specified" in 11 U.S.C. §523(a)(2), (4) or (6).  (More on that phrase, in a moment.)

In addition, for a debt to be nondischargeable under §523(a)(3)(B), two (2) potentially

relevant time deadlines must be considered.

The first is the deadline for filing proofs of claim.  That deadline is irrelevant here

because the Debtor's chapter 7 case was a no-asset case in which no deadline was set for filing

proofs of claim.  See Judd v. Wolfe, 78 F.3d 110, 114 (3d Cir. 1996).

---

[15]     Section 523(a)(3)(A) provides that if a debt is **_not_** of a kind specified in §523(a)(2), (4), or (6), the
debt is not discharged if the debt was not listed or scheduled in time to permit the timely filing of a proof
of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing.

In Judd v. Wolfe, the Third Circuit held because no deadline is set for filing claims that a no-asset
chapter 7 case, an unlisted debt not of a kind specified §523(a)(2) or (4), is not subject to the discharge
exception in §523(a)(3)(A) and is discharged  "by operation of law" when the discharge order is entered.
78 F.3d 110, 114 (3d Cir. 1996).

The Debtor's case was a no-asset chapter 7 case.  Therefore, §523(a)(3)(A) is inapplicable.  The
Defendants do not contend otherwise.

The second deadline is the deadline for requesting a determination of the
dischargeability.  Fed. R. Bankr. P. 4007(c) sets this deadline at 60 days from the first date set
for the meeting of creditors.[16]  This time frame is recognized as a "relatively short limitation
period," designed to facilitate a debtor's fresh start.  In re Dunlap, 217 F.3d 311, 315 (5th Cir.
2000).  In this case, the Rule 4007(c) deadline was October 21, 2011.

The next piece of the §523(a)(3)(B) mosaic is its "notice or actual knowledge" provision,
which creates an exception to the §523(a)(3)(B) discharge exception.  As it applies in this case, if
the Kulls had actual notice of the bankruptcy case in time to exercise their right to obtain a
determination of nondischargeability prior to the Rule 4007(c) deadline, the §523(a)(3) discharge
exception is inapplicable.  The debtor bears the burden of proof to demonstrate that a creditor
had notice or actual knowledge of the bankruptcy filing in time to trigger the exception to the
discharge exception.  See In re Main, 157 B.R. 786, 790 (W.D. Pa. 1992) (citing U.S. Small Bus.
Admin. v. Bridges, 894 F.2d 108, 111 (5th Cir. 1990)).

The final element of the §523(a)(3)(B) discharge exception is the requirement that the
debt be "of a kind" specified in §523(a)(2), (4), or (6).

When all of the elements of the discharge exception are considered together, in effect,
§523(a)(3)(B) "gives [a] creditor deprived of notice of the deadline the opportunity to assert
nondischargeability claims arising under § 523(a)(2), (4) and (6) as subcomponents of a
§523(a)(3) claim."  In re Mazik, 592 B.R. 604, 613 (Bankr. E.D. Pa. 2018).

There is, however, some division in the case law regarding the application of the
requirement that a debt be "of a kind" specified in §523(a)(2), (4) or (6).

---

[16]    The deadline applies only to debts alleged to be nondischargeable under 11 U.S.C. §523(a)(2),
(4), and (6).  There is no deadline for filing a dischargeability action for debts alleged to be
nondischargeable under other subsections of §523(a) -- including §523(a)(3).  Compare Fed. R. Bankr. P.
4007(c), with Fed. R. Bankr. P. 4007(b).

Some courts require only that a creditor not provided with notice of the §523(c) filing deadline establish only that it holds a "colorable" claim under § 523(a)(2), (4) or (6).  Other courts require that the creditor prove the merits of the § 523(a)(2), (4) or (6) claim. Compare In re Haga, 131 B.R. 320, 323-25 (Bankr. W.D. Tex. 1991) (discussing various lines of cases and adopting the "colorable" claim approach), with In re Jones, 296 B.R. 447, 449-50 (Bankr. M.D. Tenn. 2003) (discussing Haga and reaching the opposite conclusion).

I have considered the competing lines of cases and I conclude that Jones rather than Haga provides the correct interpretation of §523(a)(3)(B): the discharge exception requires the creditor to establish a meritorious nondischargeable claim under §523(a)(2), (4) or (6).

The following passage from Jones articulates the reasoning that I find persuasive:

> Reading § 523(a)(3)(B) to include a requirement that the creditor prove the merits of the incorporated § 523(a)(2), (4) or (6) action simply states the obvious policy choice already made by Congress with respect to debtors who fail to list creditors: the short time periods and exclusive jurisdiction that a scheduled defrauded creditor faces under § 523(c) and Bankruptcy Rule 4007(c) are forfeited when the debtor fails to schedule a claim that would be nondischargeable under § 523(a)(2), (4) or (6). The debtor must live with the uncertainty of an unlimited statute of limitations with respect to omitted fraud claims. The possibility that unscheduled creditors with fraud claims have a choice of jurisdictions in which to litigate nondischargeability hardly explains why the federal courts should excuse fraud creditors from proving nondischargeability when § 523(a)(3)(B) is at issue. The relaxed judge-made standard reads into § 523(a)(3)(B) congressional intent to bar the discharge of an inadvertently omitted debt—an outcome difficult to square with the robust policy of fresh start for the honest but unfortunate debtor.

296 B.R. at 451.

18

## C.  §523(a)(2)

In this case, the Defendants invoke §523(a)(2)(A) in support of their §523(a)(3)

nondischargeability claim.[17]

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge debts arising from

three (3) similar, but distinct, types of misconduct: (1) false pretenses; (2) a false representation;

and (3) actual fraud.  See e.g., In re Ricker, 475 B.R. 445, 456 (Bankr. E.D. Pa. 2012).[18]

In arguing that the Debtor committed fraud, the Defendants assert that the Debtor's debt

to Kull was the product of false pretenses.  (See Bucco Defendants' Proposed Findings of Fact

and Conclusions of Law at 34-40) (Adv. No. 19-167, Doc. # 136).

The Defendants acknowledge in their post-trial submissions that to succeed on a

nondischargeability claim under §523(a)(2)(A) based on false pretenses, a creditor must prove

the following:

> 1.   the debtor made a false representation;

---

[17]    Section 523(a)(2)(A) excepts from discharge debts

> for money, property, services, or an extension, renewal, or refinancing of credit, to the
> extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement
>> respecting the debtor's or an insider's financial condition . . . .

[18]    In Ricker, I observed that

> "[F]alse representations" [involve] affirmative statements that are false or misleading.
> "False pretenses," on the other hand, entail implied misrepresentations, omissions, or
> failures to disclose material facts that create a false impression which is known to the
> debtor. As for "actual fraud," . . . the term refers to conduct other than classic factual
> misrepresentations, which involve "any deceit, artifice, trick, or design involving direct
> and active operation of the mind, used to circumvent and cheat another."

475 B.R. at 456 (citations omitted).  The discussion in Ricker regarding "actual fraud" is consistent with
the later Supreme Court decision on the subject.  Husky Int'l Elecs., Inc. v. Ritz, 578 U.S. 356 (2016).

2.  at the time of the representation, the debtor knew it was false;

3.  the false representation was made with the intent and purpose of deceiving the creditor;

4.  the creditor justifiably relied upon the representation; and

5.  the creditor sustained damages as a proximate result of the misrepresentation.

See, e.g., Corso v. Walker, 449 B.R. 838, 848 (W.D. Pa. 2011); In re Melasecca, 2019 WL 6045476, at *3 (Bankr. E.D. Pa. Nov. 14, 2019); In re Ritter, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009).

The "intent to deceive" element can be difficult to prove since a debtor will rarely admit to an intent to deceive a creditor.  Courts may infer that a debtor made a false statement with the intent to deceive from circumstantial evidence and a consideration of the totality of the circumstances.  See, e.g., In re Cohn, 54 F.3d 1108, 1118-19 (3d Cir. 1995); In re Marshall, 623 B.R. 123, 135 (Bankr. E.D. Pa. 2020).

The party who objects to the discharge of the particular debt bears the burden of proving all of the elements of nondischargeability by a preponderance of the evidence.  In re Graham, 973 F.2d 1089, 1101 (3d Cir. 1992) (citing Grogan v. Garner, 498 U.S. 279, 288 (1991)); In re Stamp, 626 B.R. 397, 402 (Bankr. E.D. Pa. 2021).


## V.  APPLICATION OF THE LAW TO THE FACTS

In applying to relevant legal principles to the facts of this case, it is helpful to begin by discussing the parties' differing views of the facts.  I also will explain how I resolved their competing contentions in generating the Findings of Fact set forth in Part III above.  In other

20

words (at the risk of some redundancy), I will describe in narrative form the key events and the

inferences I draw from them.[19]


## A.  The Parties' Contentions

To justify their post-discharge collection activity, despite knowledge of the Debtor's

bankruptcy discharge, the Defendants contend that the Debtor intended to defraud the Kulls from

the moment he asked Mr. Kull for a loan in 2008.

According to the Defendants, the Debtor accomplished his scheme by

- lying about his ownership of the Roller and the CAT Crawler and offering those items as security when he had no power to do so in signing the 2009 Note;

- representing that he would use the loan proceeds to satisfy the Blackstone debt when he did not intend to do so;

- hiding his personal bankruptcy from the Kulls by failing to schedule his debt to the Kulls (in order to conceal the financial information revealed in his bankruptcy disclosures) and, finally;

- continuing to lull the Kulls after the conclusion of the bankruptcy by signing the 2012 Note (which referenced the purpose of the loan as paying off Blackstone when the proceeds were not used for that purpose), and making only sporadic payments to the Kulls.

The Debtor denies any fraudulent intent.  He claims he believed that he owned the Roller

and CAT Crawler when he agreed to provide Mr. Kull some security for repayment of the 2009

Note.  He claims that he did not purposely conceal his bankruptcy from Mr. Kull because he told

him of the bankruptcy filing in July 2011, shortly before they took a trip together to the Sturgis

Motorcycle Rally in South Dakota and that the omission of Kull as a creditor was an oversight.

---

[19]    To the extent that the commentary in Part V references facts not included in Part III, those facts should be treated as unenumerated Findings of Fact and part of Part III.

## B.  Narrative

Based on my observation of the witnesses, the content of their testimony, and my experience and intuition, I find neither party's version of history fully credible.  Rather, piecing together parts of their differing testimony, I find the following narrative to be the most plausible factual history in this matter.  It leads me to conclude that the Debtor's conduct was not fraudulent and that his debt to the Kulls was not excepted from discharge under 11 U.S.C. §523(a)(3).

### 1.

I start with my finding that the Debtor lacked fraudulent intent in the loan transaction with the Kulls.

Initially, I find it significant that the Debtor and Mr. Kull had a long, close friendship.  Thus, when Mr. Kull agreed to provide the Debtor with loans for GBE, it is likely that the Debtor was extremely appreciative of Mr. Kull's assistance.  The parties then proceeded without using lawyers, resulting in a substantial degree of informality in the transaction.

Next, in evaluating the parties' conduct and states of mind, I find the timeline in the transaction to be significant.  The parties executed the 2009 Note with the attached valuation in June 2009, eleven (11) months after the first loan and two (2) months after the second loan.  There is no evidence of record that the Debtor promised the equipment as collateral at the time the loans were made.  His subsequent agreement to designate the equipment, which he believed, albeit mistakenly, GBE would own upon payment of the $1.00 payoff, does not support an inference the Debtor intended to defraud the Kulls when they advanced the $60,000.00 to GBE.

22

Further, based on his understanding of the Blackstone transaction, the Debtor believed sincerely — accurate or not — that he could grant Mr. Kull a security interest in the Roller and CAT Crawler.[20]

I credit the Debtor's testimony that at time he received the loans from the Kulls, he believed the Blackstone Lease could be paid off for $1.00 at which time he would regain full ownership of the equipment. The Debtor's position is bolstered by his testimony that he did not read the Blackstone Lease prior to signing it and, especially, by his reliance upon Metrix term sheet that specifically provided for a "$1.00 Purchase Option." (Ex. P-7). The Debtor's decision to dispute the Blackstone's payoff quote and pursue counterclaims in the California Litigation further supports his credibility on this factual issue.

Finally, looking at the factual history from a more general perspective, I also find support for my conclusion regarding the Debtor's non-fraudulent intent in thirty-four (34) separate payments the Debtor made to Mr. Kull totaling $11,177.66 — five (5) in 2012, two (2) in 2013, six (6) in 2015, twelve (12) in 2016, seven (7) in 2017, and two (2) in 2018 — after completing his bankruptcy case. He also signed the 2012 Note at Mr. Kull's request. This is not the conduct of an individual who planned a fraud in 2009; it is the conduct of someone trying to repay a debt, making payments when he can afford to do so and attempting to cooperate with his creditor.

I have considered certain competing evidence marshaled by the Defendants in support of their position that the Debtor acted fraudulently, but I find that evidence less persuasive.

---

[20]    The Defendants suggest that part of the Debtor's fraud was his misrepresentation regarding the ownership of the two (2) pieces of equipment because the equipment was owned by GBE and not the Debtor personally. In the context of the loan transaction between the Debtor and Mr. Kull, I find this distinction immaterial. As the principal of GBE, the Debtor had the power to grant Mr. Kull a security interest in GBE property. Doing so was particularly appropriate because the loan proceeds were deposited in GBE's account and were for the benefit of the business entity.

The Defendants contend that the Debtor misrepresented his intentions regarding the $50,000.00 loan.  To support this contention, the Defendants point to the fact that the second check for $50,000.00 was in the same approximate amount of the lease payoff that Blackstone demanded.  But I find this unconvincing.  Blackstone made that demand on October 22, 2009, more than six (6) months after Mr. Kull gave the Debtor the second check (on April 10, 2009). Most likely, the similarity in the numbers was a coincidence.  Instead, when the Debtor obtained the second check for $50,000.00 from Mr. Kull, it is probable that he was interested in easing GBE's cash needs than paying off the Blackstone debt in full, which required only the payment of monthly instalments.

Second, there is a reference to "paying off Blackstone" in the 2012 Note, which suggests that was the purpose of the $50,000.00 advance.  However, I do not find that 2012 Note particularly probative.  The 2012 Note was entered into years after the loan transaction.  I do not know who prepared the 2012 Note.  If it was prepared by Mr. Kull, the reference to Blackstone does suggest that Mr. Kull thought he loaned the $50,000.00 to permit GBE to pay off Blackstone and he had this understanding from the outset of the loan.  But I doubt that the Debtor would have paid much attention to the reference in the document, limiting its probative value as an admission.  In short, while I cannot entirely reconcile this piece of evidence, I find it outweighed by the other evidence discussed above that supports the Debtor's credibility.

For these reasons, I credit the Debtor's testimony that the loan was for working capital for GBE and that he did not misrepresent the purpose of the loan.

Thus, based on consideration of all of the circumstances described above, I do not infer that the Debtor intended from the outset to defraud Mr. Kull by taking the loan without any

24

intention to repay it, or by purposely misrepresenting his ability to offer collateral for the loan, or

by making false representations regarding his intentions for the loaned funds.

### 2.

The next phase of the narrative are the events in 2011, starting with the Debtor's

pre-bankruptcy actions.

By early 2011, the Debtor must have understood that GBE was not viable. He closed

down the business in March 2011 and then sold off certain equipment — including the Roller (in

May 2011 for $16,000.00). He most likely used the proceeds to pay a contractor rather than the

Kulls.

There are at least two (2) ways to evaluate the Debtor's prepetition sale of the Roller.

Viewed innocently, he may have sold off certain business assets because he was being

pressed by creditors whom he considered less benign than Mr. Kull, someone he intended to

repay eventually anyway. Less innocently, as Mr. Kull sees it, it was part of the Debtor's

ongoing fraud.

It is hard to draw any firm conclusion regarding the Debtor's sale of the Roller and

disposition of the proceeds because he did not explain his thought process at trial. I do infer that

these events occurred at what must have been a stressful and difficult period for the Debtor as he

had just lost his business.

In the end, whatever doubts I may have about the Debtor's reasons for selling the Roller

without paying Mr. Kull, given the facts regarding the creation of the debt and the Debtor's

numerous payments discussed above, the sale of the Roller is not enough to convince me that it

was a piece of on ongoing fraudulent scheme.

**3.**

Next is the Debtor's bankruptcy filing in July 2011, which leads to two (2) critical

questions:

- Did the Debtor tell Mr. Kull about the bankruptcy case in July 2011?

- If not, when did Mr. Kull learn about the bankruptcy case?

I do not find the Debtor's testimony — that he told Mr. Kull of his bankruptcy filing in

July 2011, shortly before their trip to Sturgis — credible.

The Debtor's testimony was far too bare.  Had that conversation occurred, I would have

expected the Debtor to remember it vividly and to have described details of that conversation,

such as Mr. Kull's reaction to the news, the Debtor's efforts to mollify Mr. Kull's likely

concerns about being repaid, and how they worked things out to Mr. Kull's satisfaction such that

Mr. Kull was still willing to travel together with the Debtor to Sturgis.  Instead, the Debtor

described the conversation as if they were discussing a "matter of fact" topic in an offhand

manner.

By contrast, Mr. Kull testified: "if he would have told me in July that he was filing

bankruptcy, there's no way in my right mind A) I would have gone with him; B) that I would

have lent him a motorcycle."  (N.T. at 185).  I find Mr. Kull's description of his likely reaction to

the news of the Debtor's bankruptcy filing more plausible than the Debtor's recounting.

Consequently, I accept Mr. Kull's testimony that the Debtor did not tell him about the

bankruptcy filing in July 2011, just prior to the Sturgis trip.

So, when did Mr. Kull learn about the bankruptcy filing?  If Mr. Kull learned about it

sufficiently in advance of the Rule 4007(c) deadline for requesting a determination of

nondischargeability, his §523(a)(3)(B) argument that the subject debt was not discharged
(justifying all of his post-discharge collection efforts) might fail.

In Finding of Fact No. 42, I found that the Kulls "became aware of the bankruptcy case
as of December 15, 2011, the day the discharge was entered and the bankruptcy case was
closed." Here's why.

Although Mr. Kull testified that he first learned of the bankruptcy filing when he
consulted a lawyer regarding his rights to repayment after August 2012, he is bound by my
pretrial ruling on March 11, 2020, that the Kulls were deemed to have admitted certain facts
stated in the Debtor's Requests for Admission promulgated during pretrial discovery. (See Adv.
No. 19-167, Doc. # 80).

Most relevant is Request for Admission No. 17, through which the Kulls admitted that
they were aware of the existence of the bankruptcy case "during the time" the Debtor's
bankruptcy case "was open." Based on this admission, the Kulls necessarily knew of the
Debtor's bankruptcy sometime between July 24, 2011, when the bankruptcy case was filed, and
December 15, 2011, when it was closed. This admission overrides Mr. Kull's testimony that he
learned of bankruptcy in August 2012.[21]

The "between July 24, 2011 to December 15, 2011 admission" is not legally conclusive
one way or another on the §523(a)(3) "actual notice" issue. It does not establish that the Kulls

---

[21]    Generally, admissions made in response to a Rule 36 request for admission, including admission
deemed admitted, are binding on the responding party. Sec'y U.S. Dep't of Lab. v. Kwasny, 853 F.3d 87,
91 (3d Cir. 2017) (stating that matters deemed admitted due to a party's failure to respond to requests for
admission are "conclusively established" under Federal Rule of Civil Procedure 36(b)). An admission
cannot be rebutted by contrary testimony or ignored by a court simply because it finds other evidence
more credible. See Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund, 850 F.2d
1028, 1036-37 (3d Cir. 1988).

knew of the bankruptcy case in advance of the October 21, 2011, deadline for requesting a determination of nondischargeability.

At trial, the Debtor produced no credible evidence to pinpoint the time when the Kulls learned of the bankruptcy case to a date prior to October 21, 2011, other than the Debtor's testimony regarding his alleged pre-Sturgis conversation with Mr. Kull, which, as explained above, I have rejected.

The Debtor bears the burden of proof to demonstrate that Mr. Kull had notice or actual knowledge of the bankruptcy filing in time to file a nondischargeability action. See Main, 157 at 790. Since no credible evidence demonstrates more than a possibility that Mr. Kull had such timely notice or actual knowledge, the Debtor has not met his burden of proof on this important issue of fact.

**4.**

While I have rejected the Debtor's testimony on the important fact issue described just above, I find the balance of his testimony credible; i.e., that he did not intend to defraud Mr. Kull and sincerely wished to repay the debt.

The Debtor's motivation explains why he omitted the Kulls from his bankruptcy schedules. He wanted to exclude the Kulls from the bankruptcy process because he wanted to repay them. This interpretation of the evidence has the "ring of truth" because it is based on a common misconception held by prospective bankruptcy debtors: that a debtor can choose to "leave someone out" of their bankruptcy case. It provides at least a partial explanation why he did not tell Mr. Kull of the bankruptcy filing — perhaps out of embarrassment. This inference

also is supported by the Debtor's deposition testimony that that he did not inform his bankruptcy attorney of the debt owed to the Kulls.  (See JPS ¶ 19).

The Debtor's ongoing intent to repay the Kulls also explains why he signed the 2012 Note, why he made thirty-four (34) payments over a six (6) year period, and why he rewrote his will to include Mr. Kull.

I infer that the Kulls' stepped-up collection efforts, the filing of the C.P. Complaint in particular, changed everything between these life-long friends.  The lawsuit required the Debtor to seek legal advice.  At that point, he undoubtedly was advised that, even though he had not "included" the Kulls in his bankruptcy papers, he nevertheless had grounds to assert that his debt to the Kulls had been discharged and had a viable defense to the collection action.  His previously close relationship with Mr. Kull having been severed by the Kulls' initiation of the collection litigation, and as a matter of "self-defense," the Debtor probably felt that he had no choice but to raise the existence of the bankruptcy discharge as a defense to the C.P. Complaint. When the Kulls did not back down from their collection efforts (and were bolstered by the denial of the Debtor's preliminary objections by the C.P. Court), the Debtor went on the offensive and initiated this adversary proceeding to enforce his discharge rights.

### C.  The Defendants' Collection Efforts Violated the Discharge Injunction

Based on the narrative set forth above, the application of the law is relatively straightforward.

The starting point is the Debtor's contention, relying on Judd v. Wolfe, 78 F.3d at 114, that although he failed to list the Kulls as creditors in his bankruptcy case and give them notice of the case, his debt to them was nonetheless discharged, making the Kulls' post-discharge

collection efforts violative of his bankruptcy discharge.  The Defendants' response is that their

post-discharge collection efforts were proper because the subject debt was never discharged

pursuant to 11 U.S.C. §523(a)(3) because they lacked notice of the bankruptcy case in time to file

a nondischargeability complaint and the subject debt is "of a kind specified" in §523(a)(2).

The Debtor's initial response to the Defendants' §523(a)(3) argument is that §523(a)(3) is

inapplicable because the Kulls had notice or actual knowledge of the Debtor's bankruptcy case in

time to file a request to determine the dischargeability of the debt.  This response fails because I

have found that the Debtor has failed to meet his burden of proof to show such timely notice or

actual knowledge.

The next issue under §523(a)(3) is whether the debt was "of a kind specified" in

§523(a)(2).

In Part IV.B. above, I held that to establish that the debt was not discharged based on

§523(a)(3), the Defendants have to prove the merits of a nondischargeability claim under

§523(a)(2).  They have not done so.

The Defendants failed to satisfy two (2) elements of their §523(a)(2) false pretenses

claim.  They did not prove that (1) the Debtor knew he was misrepresenting his ability to grant of

Mr. Kull a security interest in the Roller and the CAT Crawler, or (2) he made a

misrepresentation with an intent to deceive.  Nor have the Defendants proven that the Debtor

misrepresented that he would use the second advance (the $50,000.00 loan) for payoff of the

Blackstone lease as opposed to working capital.

Based on Judd v. Wolfe and the Defendants' failure to establish the nondischargeability

of the debt under §523(a)(3), I conclude that the Debtor's debt to the Kulls was discharged by his

bankruptcy discharge order.  It follows that the Defendants' post-discharge collection efforts violated the discharge order.

### D.  The Defendants' Violation of the Discharge Order Does Not Rise to the Level of Contempt

The Defendants violated the discharge order, but <u>Taggart v. Lorenzen</u> instructs that they are not necessarily subject to being held in contempt for their conduct.  139 S. Ct. 1795 (2019).

It is worth repeating the <u>Taggart</u> scienter standard.  The Kulls should not be held in contempt if they had an objectively reasonable basis for concluding that their collection efforts were lawful despite their knowledge of the discharge order.  Stated from the opposite perspective, the question is whether the Kulls' belief that they had the right to collect the subject debt was "objectively unreasonable."  <u>Id.</u> at 1802.

I conclude that the Defendants' collection efforts were based on an objectively reasonable view that the Debtor's debt to the Kulls was excepted from discharge by 11 U.S.C. §523(a)(3).

It is indisputable that the Defendants knew of the discharge order when they commenced litigation in the C.P. Court.  However, the Debtor's own conduct — his failure to list the Kulls as creditors in his bankruptcy case, his sale of equipment intended to provide security to the Kulls without paying the sale proceeds to them, his execution of a post-discharge Note for the prepetition debt that was unlisted in his bankruptcy case, and his ongoing payments to the Kulls for more than five (5) years after the bankruptcy — created fair ground for doubting that the scope of his bankruptcy discharge encompassed his debt to the Kulls.  The Debtor's own actions, while not a scheme to defraud the Kulls, obscured the applicability of the discharge order to the debt owed to the Kulls.

31

In this adversary proceeding, the Kulls' contention that the Debtor failed to give them notice of the bankruptcy filing, triggering the potential applicability of the §523(a)(3) discharge exception, was vindicated by my findings. The Kulls then were unable to prove that the Debtor had the requisite fraudulent intent to render the debt nondischargeable under §523(a)(2). However, they offered probative evidence in support of their view that the Debtor's conduct was fraudulent and the subject debt nondischargeable (offered to justify their post-discharge collection efforts).

In short, although, as the fact finder, I was not convinced that the Defendants generated a preponderance of the evidence on the fraud issue, based on the quantity and quality of the Defendants' evidence, I conclude that the Defendants' subjective perception of their legal justification for ignoring the Debtor's discharge order was not objectively unreasonable. Under Taggart, this conclusion precludes the court from holding them in contempt of the Debtor's discharge order. See In re Thomas, 626 B.R. 804, 821-22 (Bankr. E.D. Pa. 2021) (where a creditor's lien rights remained undetermined after the appellate court overturned the prior determination, creditor had objectively reasonable basis for pursuing enforcement of the lien); In re Hazelton, 622 B.R. 354, 363 (Bankr. W.D. Wis. 2020) (denying sanctions because although creditor ultimately lost the issue of nondischargeability on appeal, in general, losing on an issue in court does not render the losing party's position "objectively unreasonable").

Finally, in the absence of a contempt finding, the Debtor is not entitled to an award of counsel fees.[22]

---

[22]    Nor is an award of counsel fees supported by 11 U.S.C. §523(d) because the Defendants' position regarding nondischargeability under §523(a)(2) was substantially justified.

## VI.  <u>CONCLUSION</u>

For the reasons explained above, although the Defendants attempted to collect a debt that was discharged by the Debtor's bankruptcy discharge.  My order in this adversary proceeding will resolve the parties' dispute regarding the dischargeability of the subject debt.  However, the Defendants will not be held in contempt as requested by the Debtor.

In effect, because the Defendants had a plausible nondischargeability claim under §523(a)(2), this litigation, functionally, served as a nondischargeability proceeding that occurred after the conclusion of the Debtor's bankruptcy case, rather than during the case, as is contemplated by Fed. R. Bankr. P. 4007(c).  This was possible, through the operation of §523(a)(3), because the Debtor failed to give the Kulls notice of his bankruptcy filing in time for them to raise their nondischargeability claims while the bankruptcy case was open.

The ramifications of the outcome here should not be construed as invitation to any unlisted creditor (in a no-asset chapter 7 case) to pursue its collection claims post-discharge.  If §523(a)(3) is raised in a contempt proceeding in the bankruptcy court as a justification and defense for post-discharge collection activity, the defense will succeed only if the nondischargeability is meritorious or is based on an objectively reasonable view of the law and the facts.  If not, contempt will lie.

Here, largely due to the Debtor's own conduct, the nondischargeability claim failed, but it had a sufficient appearance of merit to preclude the Debtor from obtaining contempt remedies.  Instead, as his sole relief, the Debtor has obtained a determination in his favor regarding the asserted nondischargeability of his debt to the Kulls.

An appropriate order follows.

Date:  February 22, 2022

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**